TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN







NO. 03-03-00416-CV






Dean Trahan, Appellant


v.


Texas Department of Protective and Regulatory Services, Appellee







FROM THE DISTRICT COURT OF COMAL COUNTY, 22ND JUDICIAL DISTRICT

NO. C2002-100A, HONORABLE JACK ROBISON, JUDGE PRESIDING





M E M O R A N D U M O P I N I O N




 Following a jury trial, the trial court signed an order terminating appellant Dean
Trahan's parental rights to his son, G.T. Trahan appeals, contending that the evidence is legally and
factually insufficient to support the jury's findings. We affirm the order of the trial court.


Factual Background


 Trahan met Rachel Truelove at a Narcotics Anonymous meeting in late 1999; he was
about thirty-three years' old and she was nineteen. G.T. was born to the couple on August 17, 2000,
and at the time of trial in May 2003 was nearly three years' old. G.T. and his older half-brother B.T.
were removed from Truelove's care and taken into Department custody on February 4, 2002, after
Truelove's father called the Department to report that Truelove was abusing drugs and not caring
properly for G.T. At the time the Department took custody of the children, Trahan was visiting
Truelove and the children several times a week, sometimes caring for the children and taking them
to daycare. Truelove testified that at the time of trial, her father was caring for B.T. and she was
living with them; she had lived there on and off in the past, but her father kicked her out whenever
she relapsed into drug abuse. Truelove, who used heroin through the first half of her pregnancy with
G.T., wanted G.T. to be adopted by a good family because she knew she could not care for him
properly.

 Trahan testified that for several years he had struggled with heroin addiction and
alcohol abuse; Trahan also used cocaine. Trahan said that from February 2000 through July 2000,
he used drugs, sometimes with Truelove, who was pregnant with G.T., and was arrested several
times. Trahan was not present when G.T. was born and did not meet him until June 2001 because
Trahan was in jail for theft by check from July 31 until December 8, 2000, and then went directly
into a treatment program. For several months after his release from treatment on June 1, 2001,
Trahan spent almost every day with G.T. except for four days in June when he was arrested for theft
by check and two days in October when he was arrested for stealing a chainsaw; Trahan intended
to pawn the chainsaw for money to buy heroin, which he and Truelove were using at the time. On
December 11, 2001, Trahan checked himself into another treatment center and stayed there until late
January 2002, when he was again arrested for theft. After his release on January 31, Trahan
immediately went to see G.T. He was arrested again in April 2002 for probation violations,
including using drugs and failing to pay required fees, and was last jailed from June 26 until early
November 2002. Trahan said that in the several months before trial, he had seen G.T. more often
than ever before and that his mother, his grandmother, and he had spent as much time with G.T. as
the Department would allow. Trahan and his family testified that G.T. has bonded with them and
smiles and calls out for his daddy when he sees Trahan.

 On February 14, 2002, following G.T.'s removal, the trial court signed an order
requiring Trahan to take parenting classes, undergo counseling, a psychological evaluation, and a
drug and alcohol assessment, and comply with the Department's service plan. (1) One month later, the
Department prepared a service plan requiring Trahan to attend individual counseling with a therapist,
undergo a psychological evaluation and a drug assessment, attend parenting classes and regular AA
and NA meetings, submit to random drug testing, avoid using or being around drugs or alcohol,
obtain and keep consistent employment and appropriate housing, and have two supervised visits with
G.T. each month. In July and October 2002, the Department submitted status reports stating that
Trahan was incarcerated and had not completed any of the court-ordered services. In February 2003,
the Department reported that Trahan had been released from prison in November 2002 and that the
trial court had informed the Department "that no further services needed to be provided to" Trahan. 
In March 2003, the trial court signed a report stating that Trahan had not demonstrated adequate and
appropriate compliance with the service plan.

 Trahan testified that since his most recent release from prison, he had gotten off drugs
and was trying to find and maintain employment. About three weeks before trial, Trahan began
taking a prescribed antidepressant. He is attending AA and NA meetings every day, has a sponsor,
and thinks that he can stay clean this time, but admitted that he has attended such meetings on and
off for eleven or twelve years and frequently relapsed into drug abuse. In January 2003 Trahan
completed a parenting class, and he recently completed a psychological evaluation. Trahan has a
room in his grandmother's house and is trying to repair and make childproof a trailer he has on his
grandmother's property. Trahan has not been able to find and maintain stable employment since
being ordered to do so, in part because he was sometimes arrested and imprisoned. At the time of
trial, Trahan had a job building decks. He was paid based on how many decks he built, not an hourly
wage, and he did not have medical insurance. However, he testified that he had recently been
assured of getting a job that would provide health insurance for G.T. and himself. In a recent month,
Trahan earned about $500. He pays his grandmother $225 a month in rent, borrows a truck from his
father, and pays about $60 a month for car insurance. Trahan has never made court-ordered child
support payments, but he said that in the past, when he was earning $10 or $12 an hour, he gave
Truelove money when she needed it.

 As part of his probation conditions, Trahan was ordered to pay restitution and
probation fees. He made several payments, but stopped because he could not afford it. In January
2003, Trahan tested positive for cocaine use. Trahan denied using drugs, but his probation officer
testified that Trahan admitted using cocaine once in early January. The officer also said Trahan had
missed several appointments and twice failed to submit a urine sample for drug testing. Trahan said
he could be arrested for probation violations and testified that his family would help care for and
support G.T. if Trahan is arrested.

 Therapist Rodney Keller saw Trahan three times, the last visit being about a year
before trial. Keller said that Trahan seemed to be honest, cooperative, and sincere in wanting to be
a better father and move past his addictions. However, as of their last session, Keller believed that
Trahan's prognosis for getting and staying clean was poor and that Trahan was not able to care for
himself and G.T. Dr. Dina Trevino performed a psychological evaluation on Trahan in February
2003, and testified that Trahan was open and cooperative and did not attempt to portray himself in
an overly positive way; in fact, Trevino said Trahan seemed to paint himself in a more negative light
than was warranted. Trevino said Trahan showed signs of depression and anxiety, has limited
coping skills, feels like he is a victim in his own life, does not tolerate frustration well, is not driven
to excel, and might not be a reliable employee. Trevino believes that the only way Trahan will be
successful in his drug rehabilitation efforts is if he undergoes psychiatric treatment and drug
treatment and she testified that she would hope to see two years of sobriety before she would be
comfortable with a drug-addicted person caring for a child. Melba Romo, who coordinated Trahan's
parenting class, testified that Trahan was very interested, wanted to learn, and sought out more
information than was presented in class. However, Sherry Flume, a Department supervisor, testified
that Trahan had not availed himself of most of the resources available through the Department.


Standard of Review


 A trial court may terminate a parent-child relationship if it finds that the parent has
engaged in conduct set out as statutory grounds for termination and that termination is in the child's
best interest; (2) the Department must establish these elements by clear and convincing evidence. Tex.
Fam. Code Ann. § 161.001 (West 2002); In re C.H., 89 S.W.3d 17, 23 (Tex. 2002). Clear and
convincing evidence is an intermediate standard of proof that falls between the criminal standard of
proof beyond a reasonable doubt and the general civil standard of the preponderance of the evidence
and means the degree of proof "such that a fact-finder could reasonably form a firm belief . . . about
the truth of the State's allegations" supporting termination. C.H., 89 S.W.3d at 24-25. We review
the legal sufficiency by considering all of the evidence in the light most favorable to the finding and
determining "whether a reasonable trier of fact could have formed a firm belief or conviction that
its finding was true." In re J.F.C., 96 S.W.3d 256, 266 (Tex. 2002). We must maintain appropriate
deference to the fact finder's role, assuming that it resolved evidentiary conflicts in favor of its
finding when reasonable to do so. Id. We disregard evidence that a reasonable fact finder could
have disbelieved. Id. We review factual sufficiency by viewing all of the evidence and determining
whether a reasonable fact finder could have resolved disputed evidence in favor of its findings. Id. 
If, after such a review, the disputed evidence is such that a reasonable fact finder could not have
formed a firm belief as to the truth of the State's allegations, we will hold the evidence to be
factually insufficient. Id.; C.H., 89 S.W.3d at 25.


Discussion


 The State sought termination of Trahan's parent-child relationship on three alternative
grounds, alleging that Trahan had: (1) knowingly placed or allowed G.T. to remain in conditions or
surroundings that endangered his physical or emotional well-being; (2) engaged in conduct or
knowingly placed G.T. with someone who engaged in conduct that endangered G.T.'s physical or
emotional well-being; or (3) failed to comply with a court order establishing the necessary actions
for Trahan to regain custody of G.T. See Tex. Fam. Code Ann. § 161.001(1)(D), (E), (O). If the
evidence is legally and factually sufficient to support a finding that any of those three grounds is true,
we will sustain the jury's verdict and the trial court's judgment of termination. See In re M.C.M.,
57 S.W.3d 27, 32 (Tex. App.--Houston [1st Dist.] 2001, pet. denied).

 In February 2002, more than a year before trial, Trahan was ordered to undergo a drug
assessment, obtain and maintain stable employment, take parenting classes, and undergo counseling
and a psychological evaluation. Trahan was further ordered to comply with the Department's service
plan, which, among other items, required him to avoid using or being around drugs or alcohol. Not
until February 2003 did Trahan undergo the psychological examination, and he attended only three
sessions of counseling, the last one a year before trial. Trahan completed a parenting class, but
waited until January 2003 before doing so. It appears from the record that Trahan never completed
the drug assessment, and, although he denied it, a drug test showed cocaine use and his probation
officer testified that Trahan admitted to using cocaine in early January 2003. Trahan stated he had
not been able to maintain stable employment because of repeated arrests and incarcerations. Under
the clear and convincing standard, the evidence is legally and factually sufficient to support a finding
that Trahan had violated provisions of the trial court's February 2002 order.

 Further, Trahan was incarcerated for a significant portion of G.T.'s infancy. Although
Trahan thought Truelove was a good mother when she was sober, he knew that she continued to use
drugs after G.T.'s birth. Trahan used heroin with Truelove while she was pregnant with G.T. and
after G.T. was born, and he was arrested in October 2001 for stealing a chainsaw to get money for
heroin. Trahan allowed G.T. to remain with Truelove while she was abusing heroin and spent time
with G.T. during the period he was abusing heroin himself. Truelove's own father was so concerned
about the care Truelove was providing for G.T. that he was moved to call the Department and report
her. Truelove testified that she did not believe she was able to care for G.T. properly. There was
testimony that at the time the Department took custody of G.T., he was functioning and developing
at rates slower than normal; since his removal, he had caught up to his peers in development. In
summary, Trahan used drugs while helping to care for G.T. and allowed G.T. to remain in the care
of a heroin addict who repeatedly relapsed into addiction. We recognize that Trahan appears to be
trying to get his life in order. However, for the first two and one-half years of G.T.'s three years of
life, Trahan was in and out of G.T.'s life and in and out of drug treatment. Based on this record, the
evidence is legally and factually sufficient to allow a rational trier of fact to form a firm conviction
that Trahan knowingly placed or allowed G.T. to remain in endangering conditions or surroundings
and engaged in endangering conduct or knowingly placed G.T. with people who engaged in such
conduct.

 Having held that the evidence is legally and factually sufficient to support the jury's
finding in favor of termination, we overrule Trahan's issue on appeal. We affirm the trial court's
order.



 __________________________________________

 Jan P. Patterson, Justice

Before Chief Justice Law, Justices B. A. Smith and Patterson

Affirmed

Filed: April 22, 2004

1. In September 2001, in a separate paternity proceeding, a trial court signed an agreed decree
of paternity under which Trahan was named G.T.'s father and appointed joint managing conservator
with Truelove. Trahan was ordered to pay Truelove $150 a month in child support, starting in
November 2001, and to provide or pay for G.T.'s health insurance. Trahan testified that he had not
made any of the court-ordered payments and owed Truelove almost $3,000.
2. Trahan does not challenge the jury's finding that termination is in G.T.'s best interest.